IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 23, 2010 Session

**STATE OF TENNESSEE v. DORIS ANN WHALEY**

**Direct Appeal from the Criminal Court for Washington County**
**No. 32897     Robert E. Cupp, Judge**

_____

**No. E2010-00389-CCA-R3-CD - Filed June 23, 2011**

_____

A Washington County Criminal Court jury convicted the appellant, Doris Ann Whaley, of first degree premeditated murder, and the trial court sentenced her to life.  On appeal, the appellant contends that (1) the evidence is insufficient to support the conviction, (2) the trial court violated Tennessee Rule of Evidence 611(a) by convincing her son to testify against her, (3) the trial court erred by admitting evidence regarding a telephone conversation the appellant had with a witness after the appellant's son testified, and (4) the trial court erred by refusing to give the jury a flight instruction.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and D. KELLY THOMAS, JR., JJ., joined.

Robert J. Jessee, Johnson City, Tennessee, for the appellant, Doris Ann Whaley.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Dennis Dwayne Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This case relates to the death of thirty-seven-year-old Charles "Chucky" Campbell on August 28, 2006.  At trial, John Rogers testified that he was the victim's friend for twenty-

eight years and lived on Watauga Road in Johnson City. On the night of August 27, 2006, the victim and the appellant returned a riding lawnmower the victim had borrowed. They brought the lawnmower to Rogers' house in a pickup truck. The appellant stayed in the truck, and the victim got a beer out of Rogers' refrigerator. The victim told Rogers that Rogers would not see the victim for a while because the victim was going back to jail for several years due to another driving under the influence charge. Rogers said that the couple was at his home for no more than fifteen minutes, that the appellant was the victim's "girlfriend I reckon," and that he learned the next morning the victim had been killed. On cross-examination, Rogers testified that the victim and the appellant arrived at his home about 9:00 or 9:30 p.m.

Officer Keith Sexton testified that he worked for the Washington County Sheriff's Department at the time of the victim's death. In the early morning hours of August 28, 2006, he was dispatched to a home on Furnace Road. When he arrived, the appellant was standing on the front porch and was very distraught. He said he went inside the home, noticed the front door had been "busted," and saw the victim lying on the floor. The victim was lying against a couch with his feet toward the door, and blood was on the couch and the floor. The victim was moaning, was having trouble breathing, and appeared to be dying. Officer Sexton rolled the victim, who was lying on his side, onto his back and saw he had been stabbed. He saw a folding knife with a black handle and a silver blade on a coffee table, and the knife was open. Officer Sexton and Sergeant Mark Page searched the house for any assailants, secured the scene, and allowed Emergency Medical Services (EMS) to come in and treat the victim. The appellant had blood on her hands and right leg, and Officer Sexton spoke with her. He said that according to the appellant's "first story," she came home, discovered the front door broken open, and found the victim. Officer Sexton noticed that a pickup truck with the driver's door open was parked to the side of the house and that a flower pot was turned over on the walkway leading to the front of the home.

Officer Sexton said that at first, the police thought someone had broken into the home to rob the victim. However, the appellant changed her story and told the police that she had been downstairs in the basement shooting pool with a friend, heard a loud noise, went upstairs, and found the victim. Officer Sexton stated that the appellant's changing her story "[threw] up a red flag" and that he stopped talking with her. The appellant did not appear to be rational, but Officer Sexton could not say she was under the influence of alcohol. When EMS took the victim away, the appellant's demeanor changed from worried to more calm. The appellant was not allowed back into the home until Investigator Tom Remine arrived. However, at some point, she was alone in the house for five to ten minutes.

On cross-examination, Officer Sexton testified that the appellant had blood on her shorts but that he did not remember blood on her shirt. The victim was moving his arms and

legs, and EMS moved the coffee table to work on him. Officer Sexton said that blood was on the floor, carpet, and walls and that a "serious fight" appeared to have occurred. He did not see the appellant hide anything.

Deputy Lonnie Ratliff of the Washington County Sheriff's Department testified that he responded to a stabbing on Furnace Road. The victim was lying on the floor, and EMS was working on him. A bookcase was turned over, and everything was in disarray. Deputy Ratliff saw a black knife on a coffee table, and the knife was folded up. He did not think the appellant was a suspect and went outside to talk with her. The appellant kept wanting to go back into the house to use the bathroom and get a cigarette, but Deputy Ratliff would not let her. The appellant told him that she and the victim had returned a lawnmower to someone on Watauga Road and drank alcohol there, and Deputy Ratliff could smell alcohol on her breath. He said the appellant told him that she and the victim returned home and that she was downstairs shooting pool while the victim was upstairs. The appellant heard a thud and wrestling, went upstairs, and saw the victim lying on the floor. Deputy Ratliff noticed that a pickup truck was parked in the middle of the front yard, which he thought was odd, and that one of the truck's doors was open. He said that he asked the appellant why the truck's door was open and that "she didn't really give me a good answer on that."

On cross-examination, Deputy Ratliff testified that the appellant may have been in shock. He did not see any wounds on her. Her clothing was not torn, and he did not see any blood on her tank top.

Lieutenant Mark Page of the Washington County Sheriff's Department testified that he arrived shortly after Officer Sexton, went into the house, and saw a white male lying on the floor. While EMS worked on the victim, Lieutenant Page and Deputy Ratliff went outside to look for evidence, and Officer Sexton stayed with the appellant. Lieutenant Page noticed a truck with a door open parked to the left of the house. He looked for evidence that somebody else had been at the home but did not find anything. While putting up crime scene tape, Lieutenant Page saw Investigator Tom Remine talking with the appellant on the front porch. Investigator Remine and the appellant went inside the house. Lieutenant Page also went inside, and Investigator Remine asked if he had seen a knife. Lieutenant Page told him no. They began looking for a folded knife with a black handle and found it behind a bookcase.

On cross-examination, Lieutenant Page testified that when he arrived at the scene, the appellant was in the living room with the victim. The appellant was near the victim, but she was not holding him. Lieutenant Page did not see any wounds on the appellant or any blood on her shirt. The appellant was upset, and the victim was gasping for air but was not combative. Lieutenant Page said the front door had been kicked in and was "splintered."

-3-

Tom Remine, a former investigator with the Washington County Sheriff's Department, testified that EMS already had removed the victim from the house when he arrived. The floor was blood-stained, the stereo speakers were overturned, and compact discs were thrown about. One bookcase was overturned, but another bookcase was standing. The front door had been forced open and was damaged. Remine did not see a knife on the coffee table, and the appellant, who was not considered a suspect, was allowed back inside. The officers began looking for a knife and found it behind the standing bookcase. Remine asked the appellant how it got there, and she said she did not know. Later, Remine interviewed the appellant at the sheriff's department. Remine said that the appellant referred to being downstairs and that he asked her, "Did you not hear what obviously [had] happened upstairs?" He said the appellant told him that "she didn't hear any of that."

On cross-examination, Remine testified that he went to a mobile home on Cash Hollow Road and spoke with a woman who said Shyane Paul, the appellant's son, came to her home on the morning of August 28. Paul wanted to come inside, but she refused to let him in because he was covered in blood, and she was afraid. Remine went to another house on Cash Hollow Road and spoke with a man who had allowed Paul to come inside to clean up. The man told Remine that he thought Paul was covered in mud and that he gave Paul a change of clothes. Officers later found Paul's wet and muddy clothes in a bag thrown into some weeds on Cash Hollow Road, a short distance away from the man's home. Eventually, the appellant told Remine that Paul had been to her home on the night of the victim's death, and Remine accused the appellant of covering for Paul. Remine acknowledged that he may have lied to the appellant during her interview and that she did not confess to killing the victim. Remine and some other officers later arrested Paul at a motel in Bristol. He said he did not remember a woman named Misty Heatherly telling him that Paul confessed to killing the victim. Remine said that Paul claimed he did not kill the victim but that Paul said the appellant "could not do the time." Therefore, Remine assumed Paul was preparing to take the blame for her. Paul told the police that on the night of the victim's death, he was afraid of what was going on in his mother's house and kicked the door open.

Dr. Paul Benson, a forensic pathologist who performed the victim's autopsy, testified that the victim died from multiple stab wounds. The victim received thirty stab wounds, and several were lethal, including a wound to the left chest that penetrated the victim's heart. The victim's lung also was stabbed several times. The victim had defensive wounds on his hands and arms. Dr. Benson inspected various knives, including a black-handled folding knife, that he received from the Washington County Sheriff's Department but could not match the wounds to any particular knife. The victim's deepest stab wounds were four to five inches deep. Although the blade on the black-handled knife was three inches long, he explained that a knife with a blade shorter than the wound still could have caused the wound because the body was compressible. The victim had two bruises consistent with blunt force on the right

side of his neck, and Dr. Benson acknowledged that the bruises were consistent with a choke hold or being struck by a fist or object. The victim had one bruise on the left side of his neck, and his blood alcohol level was 0.217, meaning he was intoxicated at the time of his death. Dr. Benson clipped the victim's fingernails for analysis.

On cross-examination, Dr. Benson testified that the wounds on the victim's hands would have been bleeding and could have caused blood spurts or spatters. The victim had a stab wound on his lower chin, and the wound would have been dripping blood. He said that whoever killed the victim could have had blood on his or her person. Some of the victim's wounds had sharp edges on both sides, meaning they could have been caused by a knife with two sharp edges. He acknowledged that none of the knives he examined were two-edged knives. He said that if all of the victim's stab wounds occurred at the same time, the victim probably would not have lived for more than ten or fifteen minutes. The victim was five feet, three inches tall, and one of the stab wounds on the victim's head came from above. The victim's blood alcohol level was more than two and one-half times the legal limit for the presumption of intoxication, and Dr. Benson thought the victim's level of intoxication would have affected his ability to fight off his attacker.

Paramedic Donnie Surber from Johnson City EMS testified that he was dispatched to a home on Furnace Road at 3:56 a.m. on August 28, 2006, and made contact with the victim at 4:04 a.m. Surber said that he saw a knife on the coffee table or on the floor and that EMS may have "scooted" the coffee table out of the way in order to get to the victim. The knife was open, and blood was half-way up the blade. The victim was lying on the floor, was awake, and responded to painful stimulation. The victim had a low carotid pulse, shallow breathing, and was bleeding profusely. He moaned, groaned, and rolled from side to side when his wounds were touched. He also moved his arms. Surber did not see any blood in the victim's mouth and inserted an oral airway. EMS left the scene with the victim at 4:21 a.m., and the victim had a dropping pulse rate when he arrived at the hospital at 4:31 a.m. The victim was pronounced dead at the hospital.

On cross-examination, Surber testified that the victim weighed about one hundred eighty-five pounds. He acknowledged that the victim was bleeding profusely from multiple wounds to the torso, right arm, and forehead and that blood was puddling on the floor. Although the victim responded to painful stimulation, he was not combative.

Special Agent Forensic Scientist Bradley Everette of the Tennessee Bureau of Investigation (TBI) Crime Laboratory's DNA/Serology Unit testified that he analyzed evidence collected in this case. Blood was on a black-handled folding knife, but the knife was not covered in blood, and a blood spot on the knife handle belonged to the victim. Blood also was on the blade, but Agent Everette obtained only a partial DNA profile and could not

exclude the victim or the appellant as possible contributors. The victim's blood was on a beer can collected from the crime scene, and DNA on the mouth of the can was a mixture of the appellant's and the victim's DNA. Blood was on the bathroom sink and a soap dish. However, Agent Everette could only obtain partial profiles from the samples and could not exclude the appellant or the victim as possible contributors. Agent Everette obtained a partial profile on a blood sample collected from the living room wall, and it was consistent with the victim's profile. The victim's blood was on a door jamb in the bedroom and the appellant's clothes. DNA collected from the fingernails on the victim's right hand matched the victim. DNA collected from the fingernails on the victim's left hand was a mixture of the victim's DNA and another person's DNA, and Agent Everette could not exclude the appellant as a possible contributor. Agent Everette excluded Shyane Paul as a contributor to the DNA on the folding knife, the beer can, the sink and soap dish, the living room wall, and the fingernail clippings. Testing on Paul's clothing found on Cash Hollow Road showed no blood present.

On cross-examination, Agent Everette testified that he did not find any tissue on the knife blade or any blood in the "track" where the knife was folded. The appellant's DNA was not on the knife handle. He acknowledged that Paul and the appellant shared one-half of their DNA.

Paulette Sutton testified as an expert in bloodstain pattern analysis. She examined the appellant's clothing and found impact spatter, created by blunt force like a stab, on the appellant's shorts. Sutton found eleven blood spatters on the right leg of the shorts and seven on the left leg. She said the patterns on the shorts were consistent with the wearer's having been in the "vicinity" of the victim at the time of the stabbing. In other words, the wearer was within eight feet of the victim. She said the patterns were also consistent with the wearer being the person who stabbed the victim.

On cross-examination, Sutton acknowledged that she was not saying the appellant stabbed the victim, just that the appellant was in the "vicinity" of the stabbing. Blood was on the appellant's tank top, and Sutton acknowledged that the stains were consistent with the appellant's cradling the victim's head. Sutton did not find any blood spatters on the tank top. She acknowledged that if the appellant had stabbed the victim "point blank," she would have expected to see blood spatters on the appellant's shirt. She acknowledged that the spatters on the appellant's shorts could have resulted from the victim's spitting out blood. She said that if the victim was flailing his arms, his arms also could have caused spatter. However, the spatter would have had a linear pattern.

On redirect examination, Sutton testified that Donnie Surber said he did not see any blood in the victim's mouth. The spatter on the victim's clothing did not have a linear pattern.

Earnestine Grace testified that she lived on Cash Hollow Road with her son, Billy, who had severe short-term memory loss due to an accident. Billy lived in his own area in Grace's basement. On August 28, 2006, Grace heard on television that the victim had been killed. Later that day, she went downstairs and saw her son talking to Shyane Paul. Paul had just gotten out of the shower, and Grace's son gave him some clothes to wear. Grace fixed Paul something to eat, and Paul was very polite. He left with his old clothes in a bag. The next day, the police came to Grace's home, and she told them about Paul's having been there.

Lieutenant William Gregg of the Washington County Sheriff's Department testified that he went to Cash Hollow Road on August 30, 2006, and found a bag containing Shyane Paul's clothes on the side of the road. He searched the appellant's home for fingerprints but did not find any viable prints for testing.

Thirty-two-year-old Howard Shyane Paul testified on the third day of trial that in 2006, he was on parole from a seventeen-year sentence received for sale of a Schedule II controlled substance, possession of a Schedule VI controlled substance, failure to appear, and fifteen counts of burglary. In the early morning hours of August 28, 2006, Paul arrived at his mother's house and found the door locked, which was unusual. He looked through a window and saw an entertainment center turned over. He went to the front door, looked through the blinds, and saw the appellant and the victim on the floor. Paul began beating on the door, but no one answered it, so he kicked the door open. He said the appellant "was just kind of scrunched down and leaned over." The victim was lying on the floor, and Paul could not see if the appellant was holding the victim. Paul ran inside, and the appellant turned around and started crying. He said she told him, "Bubba, help me. I've got to find my phone." Paul said he told her, "Momma, honey, I love you, but I can't help you." He said that the appellant had a weapon in her hand but that "I couldn't tell. It just looked like a knife." He said he was only in the home for three or four seconds and ran away because he did not want to go back to prison. Paul ran through the woods and fell into mud puddles and rolled down hills. He went to Billy Grace's home and took a shower. He acknowledged that the police arrested him for the victim's murder and said that he considered taking the blame for the victim's death. However, he later talked with Investigator Chris Bevins and implicated the appellant. He said that he did not kill or stab the victim and that he currently was in jail for a parole violation.

On cross-examination, Paul testified that he did not have a knife on August 28 and that he got to the appellant's house about 3:00 a.m. After he fled his mother's home, he slept

in the woods for a while. Then he went to a friend's home for fresh clothes, but no one in the home would help him, so he went to the Grace home. He said his old clothes were wet and "stunk." He put them in a bag and threw them across the street. He said that he planned to come back for them later and that he was not trying to hide his clothes. He and Misty Heatherly went to Bristol, Tennessee, but Paul was not hiding there. He said he told Heatherly that he looked through the window at the appellant's home and saw the victim's hand in the appellant's hair. He denied telling Heatherly that the victim was holding the appellant by the hair of her head. The police arrested Paul in Bristol.

Crystal Hensley testified that she and the victim had two children together and had "years and years of a relationship." Two days before the victim's death, the victim came to Hensley's home and asked her to marry him so they could finish raising their then fifteen-year-old daughter. While he was there, Shyane Paul arrived and knocked on the door. Hensley said the victim was "kind of hiding" from Paul but that Paul saw him and said, "Chucky, come out from behind the wall. I see you standing there. Don't be such a pussy." The victim left with Paul. Hensley said the victim was staying with the appellant and "using her for money and drugs."

Hensley testified that at 10:17 p.m., on August 27, 2006, the appellant telephoned her and asked her to come get the victim because he was intoxicated. Hensley told the appellant that she could not come because her child was in bed. At 12:36 a.m. on August 28, 2006, the victim telephoned Hensley and asked her to come get him. Hensley told him that she did not have any money for gasoline. About 3:00 a.m., the victim telephoned Hensley again and told her that he and the appellant had been arguing and fighting and that he was hiding under a porch. Hensley said the victim wanted her to come get him, was in "distress," and sounded fearful. Hensley said she could hear the appellant screaming and cursing at the victim and that the appellant sounded like she was "tearing the house apart or something." Hensley heard the appellant say, "I want my fucking phone" and "If you don't bring me my phone by the time I count to three, you're a dead motherfucker." She said the appellant was in a rage and that the appellant said, "One, two, three. . . . That's it, four, five. You're dead, motherfucker." By that time, the appellant had moved from underneath the porch and was hiding under a truck. She said that the victim sounded like he had been drinking and that he told her, "Fuck it. I'm just going to sit down in the truck. . . . What's she going to do?" Hensley said she thought the appellant and the victim were just arguing and drinking and that she never thought the victim would be killed. Later that morning, she learned the victim was dead.

On cross-examination, Hensley acknowledged that on the day Paul came to her house, the victim was afraid of him. Paul spoke harshly to the victim, and Hensley was concerned for the victim. The victim left with Paul, and they did not seem to have any problems with

-8-

each other. Hensley said the appellant had been "threatening to sic Shyane Paul on [the victim]." She said that during her last telephone conversation with the victim on August 28, the appellant was "hollering, like, maybe someone else was there." She said that she thought she heard the appellant say, "Son, son" or that the appellant could have said, "John." She acknowledged that while the appellant was counting and threatening to kill the victim, the victim was laughing and not taking the appellant seriously. She denied that "bad blood" existed between her and the appellant before the victim's death and said that she and the appellant "got along great."

Investigator Chris Bevins testified that he worked for the Washington County Sheriff's Department at the time of the victim's death and was the primary agent for this case. On August 28, Investigator Bevins went to the appellant's home on Furnace Road. The victim had been removed from the scene, and Investigator Remine told Investigator Bevins that "there's something that's not right with [the appellant's] statement." Investigator Bevins sat down with the appellant in the kitchen. The appellant was not upset and was fairly calm. Later that morning, the appellant gave a written statement at the police department. According to the statement, she and the victim returned a lawnmower to "John." When they returned home, the appellant parked to the side of the house. John and his wife had followed them home. The appellant and the victim entered the home through the basement door, the appellant began "racking the balls" to play pool, and the victim went upstairs. The appellant heard a "kathump." A few minutes later, she yelled for the victim, went upstairs, and found the victim lying on the floor. She said that she asked the victim what was wrong, that he could not speak, and that she could not find her cellular telephone. She ran to a neighbor's house to call 911. She returned home, saw the front door open, and held the victim until the police arrived.

Investigator Bevins testified that after the appellant gave her first written statement, he interviewed her. The State played a video recording of the interview. During the interview, the appellant said she and the victim returned the lawnmower to John and that she and the victim were at John's house "forever." She drove herself and the appellant home. John and his wife were supposed to follow them, but the appellant did not check her rearview mirror to see if John and his wife were behind them. The appellant and the victim entered the house through the basement door, and the victim went upstairs. They had been home for fifteen or twenty minutes when the appellant heard a thump. She looked up at the ceiling, went upstairs, and found the victim. She did not hear anyone scream or struggle and ran to the neighbor's house to call 911. She said that she had been drinking but denied that she and the victim had been fighting. She said that Shyane Paul was living with her but that she had not seen him in two days and that Paul "thought the world" of the victim. She said that she loved the victim and that he was a good man. Later in the interview, the appellant told Investigator Bevins that after she and the victim returned home from John's house, she went

upstairs to take a shower. The telephone rang, and she came out of the bathroom to answer it. The call was for the victim, who was sitting on the porch, and he came inside. The appellant gave the phone to the victim, went back into the bathroom, and took a shower. Then she went downstairs to the basement so she and the victim could play a game of pool. She told Investigator Bevins that she forgot to tell him about taking the shower and the telephone call because "you all have had me torn all to Hell. I haven't had, I haven't had no sleep." She maintained that she did not kill the victim.

The State also played the appellant's 911 call for the jury. During the call, the appellant said that she was calling from her neighbor's home, that a stabbing had occurred at the Whaley house, and that she could not find her telephone. She told the operator that she did not know who stabbed the victim and that "I was in bed[.] . . . And I heard the commotion." She said the victim was conscious and breathing, that she did not know where he was bleeding from, that she had blood all over her, and that "I need to get back down there."

Investigator Bevins testified that the appellant complained her toe hurt. He identified photographs of the appellant, showing various marks and bruises on her upper arms, left buttock, right leg, and right inner thigh. He said the appellant's cellular telephone was found in the victim's pants pocket. On the afternoon of August 28, Investigator Bevins learned the appellant wanted to speak with him again. He met with her, and the appellant gave a second written statement. According to the statement, the appellant and the victim returned from John's house and entered her home through the front door. The telephone rang, the appellant answered it, and she gave the phone to the victim. She and the victim sat on the couch for a while to watch a movie, and the appellant went to bed. Something woke the appellant. She walked down the hall and saw Paul and two other people in the living room with the victim, who was lying on the floor and covered in blood. Paul told the appellant, "Oh, God, Momma." The appellant could not find her telephone, ran across the street, called 911, and returned to the victim. After EMS took the victim away, the appellant saw the victim's knife on a shelf. She said she must have "bumped" it when she got a cigarette.

Investigator Bevins testified that on August 29, 2006, the police arrested Paul in Bristol for a parole violation. Investigator Bevins identified photographs of Paul taken after his arrest, showing minor scratches on his arms and hands. On August 31, 2006, Paul was charged with the second degree murder of the victim. About one week after the victim's death, Paul told Investigator Bevins that he had not hurt the victim. However, Paul's murder charge was not dismissed until several months later when the TBI finished analyzing the evidence.

On cross-examination, Investigator Bevins testified that a hair found in Paul's shoe was sent to the TBI for testing but that he learned the TBI did not extract DNA from hair. He acknowledged that Paul told him that Paul "would set things right with his mother and his mother would not do any time." Investigator Bevins denied telling the appellant's brother that he was certain the appellant did not kill the victim. He acknowledged that the appellant broke her toes while running to the neighbor's house to call 911, that he lied to the appellant during her interview, and that telephone records showed the victim called Misty Heatherly, Paul's girlfriend, at 3:12 a.m. on August 28, 2006. He said the victim left a message on Heatherly's telephone, was mumbling, and told her, "Call me." The victim telephoned Heatherly again at 3:13 and 3:22 a.m. Investigator Bevins said he thought the victim was calling Heatherly to get a ride, and he acknowledged that the victim could have run to some nearby houses if the victim was scared. He acknowledged that a woman named Pepper Dawson claimed she dropped Paul off at the appellant's house about 3:30 a.m. When asked if he thought Paul was at the house while the victim was calling Paul's girlfriend, Investigator Bevins said, "I don't know."

On redirect examination, Investigator Bevins testified that when he interviewed Paul about one week after the victim's death, Paul's eyes filled with tears. Paul cried for a few minutes and said he could not believe his mother was putting him in that situation. Investigator Bevins said Paul told him that Paul had planned to take "the rap" for the victim's death but that Paul decided to "tell what he saw." Investigator Bevins said the appellant did not cry during her six-hour interview.

Betsy Ann Doran testified on the fourth day of trial that she had been Shyane Paul's girlfriend since 2008 and grew up with him. She said that on the previous day, the third day of trial, Paul testified against the appellant, and Doran visited him in jail about 4:00 p.m. That night, the appellant telephoned Doran and left a message for Doran to call the appellant. Doran telephoned the appellant, and the appellant told Doran that Paul had been forced to testify. The appellant also told Doran that Paul lied during his testimony. Doran said the appellant told her to write a message to Paul, stating that Paul needed to get a lawyer and have his testimony "overturned." The appellant instructed Doran to show, not tell, the message to Paul in order to keep it secret and threatened Doran if Doran did not do as the appellant had instructed. The appellant told Doran that on the night of the victim's death, she arrived home to find her front door broken open and Paul passed out. The victim was lying in a pool of blood, and the appellant ran to call for help. When she returned home, Paul was gone.

Doran testified that she was able to use her telephone to record parts of her conversation with the appellant, and the trial court allowed the State to play the recording for the jury. According to our review of the three-minute recording, the appellant left Doran a

voice message at 7:07 p.m., which said, in pertinent part, "Hey girl, call me back. It's fucking important. . . . I just found out they can't do that shit to Shyane. . . . Where the fuck was his lawyer and stuff? . . . And he needs to talk to him a lawyer, baby. So, tell him that. See? You know I still love him. Bye." In Doran's subsequent conversation with the appellant, the appellant told Doran that if the appellant had killed the victim, she would not have run to the neighbor's house because "I ain't going to run to call the law on myself. Correct?" She also told Doran that the only thing in her home that had a mixture of her DNA and the victim's DNA was a "fucking beer can." The appellant also told her,

> I'm telling you you better get done what I'm telling you to do.
> . . . I'm going to trust you on this one. Don't fuck me 'cause
> then you'll have to answer to me. . . . Do what I told you to do,
> girl. And then come over here and talk to me about it. I ain't
> talking no more fucking shit over the phone.

On cross-examination, Doran acknowledged that her telephone showed she called the appellant at 6:04 p.m., more than one hour before the appellant left the message on Doran's phone. Doran said she did not remember calling the appellant at 6:04 p.m. and that she would not get into trouble to help Paul.

Karen Guinn, the Clerk for the Washington County Criminal Court, testified for the appellant that part of her duties was to maintain arrest warrants. She acknowledged that at defense counsel's request, she "pulled" an arrest warrant for Charles Campbell, the victim. Regarding the victim's height, she said, "This is a copy of an arrest warrant dated June 20, 2007, and it's showing six (6) foot one (1) inch." She said the warrant showed the victim's weight was one hundred seventy pounds.[1]

Pepper Dawson testified that shortly before 3:00 a.m. on August 28, 2006, Shyane Paul telephoned her and told her that he needed a ride home. Dawson picked up Paul on Bristol Highway and dropped him off at the appellant's house about 3:15 a.m. She said that she did not see the victim hiding anywhere and that she thought Paul was under the influence of crack cocaine.

---

[1]The State did not cross-examine Guinn. After Guinn testified, the State and defense counsel approached the bench, and defense counsel noted that Dr. Benson had testified the victim was five feet, three inches tall. The State replied, "His tape measurer must have malfunctioned." The arrest warrant was not entered into evidence. However, if Guinn testified correctly, the warrant was issued almost a year after the victim's death. According to Dr. Benson's autopsy report, the victim was five feet, three inches tall and weighed one hundred seventy pounds.

On cross-examination, Dawson testified that she drove away and did not see Paul go into the house. She said Paul seemed "shaky" and "really hyper" from the cocaine.

Officer James Mitchell Cornett, Jr., of the Washington County Sheriff's Department testified that he worked at the Washington County Detention Center. He acknowledged that on August 31, 2006, Shyane Paul told him, "I just did what I had to do, if you know what I mean." He said Paul was upset and crying.

Charles Williams testified that on August 28, 2006, he lived with his girlfriend on Cash Hollow Road, was in bed, and heard someone beating on the door. His girlfriend answered the door and said Shyane Paul was there. Williams went to the door, and Paul told him that something had happened and that Paul needed a place to hide and a change of clothes. Paul told Williams that he stabbed the victim. Williams said Paul was wet and had "red stuff" on his clothes. He acknowledged that the red substance looked like blood. He said that Paul was "pretty messed up" and that he thought Paul may have killed the victim over drugs. He said that Paul stood on the back porch, that he would not let Paul into the house because Paul had stabbed the victim, and that he told Paul, "[G]et off my property." He said that the only reason he was testifying was because he had been subpoenaed and that he was telling the truth. He acknowledged that he had a criminal record.

On cross-examination, Williams testified that Paul came to the house about daylight. He said he thought he saw blood on Paul's hands. He acknowledged that he never told his story to the police and said that the appellant never threatened him.

Cindy Rosenbaum testified on rebuttal for the State that in August 2006, she lived with Charles Williams. On the morning of the victim's death, Shyane Paul came to their house and knocked on the door. Rosenbaum got out of bed and answered the door. Paul was wet and wanted a change of clothes. She said that he did not appear to be under the influence of anything, that he was calm, and that nothing seemed wrong. He stepped into the house, and Williams came to see what was going on. Williams was mad and accused Rosenbaum of sleeping with Paul. Williams and Rosenbaum gave Paul a cup of water, and Paul left. Rosenbaum said that Paul did not say anything about stabbing the victim and that she was with Paul the entire time he was at her home.

Investigator Bevins was recalled by the State and identified the shorts the appellant was wearing during her interview on August 28, 2006. He said he did not notice blood spatter on the shorts until the shorts came into his custody and he was able to examine them. He said that if he had known about the spatter at the time of the appellant's interview, he would have asked her about it. On cross-examination, Investigator Bevins acknowledged that he saw blood on the appellant's shirt during her interview.

The jury convicted the appellant of first degree premeditated murder. The trial court immediately sentenced her to life.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant argues that the evidence is insufficient to support her conviction because the proof showed that Shyane Paul was at the scene of the murder, ran to two houses in order to shower and change clothes, fled to Bristol to hide from the police, and confessed to killing the victim, whereas the appellant called 911 to the scene and steadfastly denied killing the victim. The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Genaro Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

-14-

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The appellant does not contest whether the victim's murder was premeditated but whether the evidence is sufficient to prove her identity as the victim's killer.

Taken in the light most favorable to the State, the evidence shows that on the night of August 27, 2006, the appellant and the victim returned a lawnmower to a home on Watauga Road and returned to the appellant's home on Furnace Road. About 11:00 p.m., the appellant telephoned Crystal Hensley and told her to come get the victim because he was intoxicated. At 3:00 a.m., the victim telephoned Hensley and told her that he and the appellant had been drinking and arguing. Hensley could hear the appellant screaming and cursing at the victim. The appellant demanded that the victim, who was hiding under the porch from the appellant, return her telephone or she was going to kill him. When the victim did not return the phone to the appellant by the time she counted to three, the appellant said, "You're dead, motherfucker." The victim, who had moved from underneath the porch to underneath a pickup truck, told Hensley that he was going to quit hiding and sit in the truck. Shortly after the victim's telephone conversation with Hensley, Shyane Paul returned home. When he could not get into the appellant's house, he looked through a window and saw the appellant on the floor with the victim. Paul kicked open the front door, saw the appellant holding a knife, and saw the victim lying in a pool of blood. The victim had been stabbed thirty times. The appellant gave numerous, conflicting accounts of what transpired in the early morning hours of August 28, 2006, and the defense cross-examined Paul and many other witnesses extensively about Paul's possible involvement with the victim's death. The jury determined that the appellant killed the victim. The identity of the appellant as the person who committed the crime was a question of fact for the jury. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The evidence is more than sufficient to support the appellant's conviction for first degree murder.

B. Shyane Paul's Testimony

The appellant contends that the trial court violated Rule 611(a), Tennessee Rules of Evidence, by convincing Shyane Paul to testify when Paul wanted to remain silent. The State argues that the trial court's comments to Paul were not improper. We agree with the State.

The State called Paul to the stand, and Paul testified briefly about his background. However, when the State began asking him about what happened on August 28, 2006, Paul said, "You can't make me testify on my momma." The trial court said, "Yes, he can. Answer his questions." Paul replied, "I'm not testifying on my mother." The trial court ordered the jury out of the courtroom and instructed Paul as follows:

Sir, the only thing you cannot testify to or be made to testify to is any questions concerning your culpability in this case. You have the right to take the Fifth Amendment on any question asked you about whether or not you've got any involvement in this case as far as them pointing the finger at you and saying, Did you commit this crime? You have the right to take the Fifth Amendment. You don't have the right to do that as far as any questions asked about your mother. . . . I'm just giving you fair warning. Every time he asks you that question and you refuse to answer it, I'm going to find you in contempt of this court, and I'm going to add ten (10) days on every time you refuse to answer. . . . You must answer his questions. Do you understand me?

Paul said he understood but was not going to testify, and the trial court continued as follows:

Well, I'm going to let [the State] lead. Let me warn you, sir. You can leave an impression with this jury that your mother committed this homicide by your actions. I'm just letting you know what you can do. If he begins to ask you questions and you begin to say those type things, I can just -- I'm going to take the contempt away from you. . . . I'm not sure they can get you there with her that night or not, but apparently they can. They've got some stuff at least in the record. And I'm going to let [the State] lead, . . . but it's up to you whether you answer the questions or not. But I'm just telling you that you can have severe consequences to your mother. Your call. Bring the jury back in.

When the State resumed questioning Paul, it asked him, "Mr. Paul, when you arrived home on August 28, 2006, was Chucky Campbell laying in the floor with blood all over him?" Paul replied, "Yes, he was." Paul continued to testify and never invoked his Fifth Amendment right against self-incrimination. The appellant contends that the trial court violated Tennessee Rule of Evidence 611(a) because the court's comments to Paul were inappropriate when the court knew the defense would implicate Paul in the victim's murder.

Generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). Tennessee Rule of Evidence 501 provides, "Except as otherwise provided by constitution,

statute, common law, or by these or other rules promulgated by the Tennessee Supreme Court, no person has a privilege to . . . [r]efuse to be a witness." Citing Rule 501, this court has explained that "[a] witness has no right to refuse to answer any and every question asked him in a judicial proceeding. He has only the right to invoke the Fifth Amendment with respect to matters that will incriminate him." State v. Stapleton, 638 S.W.2d 850, 855 (Tenn. Crim. App. 1982). Tennessee Rule of Evidence 611(a) states that a trial court "shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel."

Initially, we note that the appellant never objected to the trial court's statements to the witness. See Tenn. R. App. P. 36(a). Moreover, the appellant does not contend that there has been an "abuse by counsel" as mentioned in Rule 611(a). In any event, it is "well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993); see also Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). In the instant case, Paul refused to testify on the basis that the appellant was his mother. Pursuant to Tennessee Rule of Evidence 501, that was not a valid reason for refusing to be a witness. Therefore, the trial court did not abuse its discretion by ordering Paul to answer the State's questions. Furthermore, although the trial court threatened to hold Paul in contempt for refusing to testify and told him that his refusal could leave a bad impression with the jury, the trial court later stated that because it was possible the State could link Paul to the crime scene, he could refuse to answer the State's questions and the court would not hold him in contempt for doing so. Paul chose to testify and never invoked the Fifth Amendment.[2] The trial court's comments to Paul were not improper.

## C. Doran's Testimony and Recording

The appellant contends that the trial court erred by allowing Betsy Ann Doran to testify about her conversation with the appellant and by allowing the State to play for the jury the recording Doran made of that conversation. She argues that the evidence was inadmissible pursuant to Tennessee Rule of Evidence 403 because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice; Rule 404(b), because the appellant's character was not at issue and the recording contained profanity and veiled threats; and Rule 615, regarding the exclusion of witnesses from the courtroom. The State argues that the trial court properly allowed the testimony and recording into evidence. We agree with the State.

---

[2]Even if Paul had invoked the Fifth Amendment, "A criminal defendant lacks standing to complain of the violation of a third party's Fifth Amendment privilege against self-incrimination." State v. Austin, 87 S.W.3d 447, 479 (Tenn. 2002)

On the morning of the fourth day of trial, the trial court announced outside of the jury's presence that it had been approached in chambers by the parties regarding a particular matter and that it wanted the parties to put the matter on the record. The State explained that on the previous night, Betsy Ann Doran had reported to the sheriff's department that the appellant left a voice message on her telephone, that Doran had a conversation with the appellant, and that the appellant threatened Doran. Doran used her phone to record parts of her conversation with the appellant. The defense requested that Doran not be allowed to testify about the conversation and that the State not be allowed to play the recording for the jury on the basis of "probative versus prejudicial value." The trial court stated, "I'll agree with you, it's highly prejudicial, . . . but she's the one who put it in motion." The trial court also said that it had listened to the recording and that the appellant's statement were "highly probative." The trial court ruled that Doran's testimony and the recording were admissible.

Regarding the appellant's claims that Doran's testimony and the recording violated Tennessee Rules of Evidence 404 and 615, the appellant did not object to the evidence on the basis of those rules at trial and did not raise those claims in her motion for new trial. Therefore, they are waived. See Tenn. R. App. P. 36(a), 3(e).

Regarding the relevance of the evidence, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

As to the admissibility of Doran's testimony, Doran testified that the appellant left a message on Doran's phone, asking Doran to call the appellant because the appellant needed to speak with Doran about something important. Doran said that she returned the appellant's call and that the appellant told her Paul lied during his testimony. Doran said the appellant also told her that on the night of the victim's death, the appellant arrived home to find her front door broken open and Paul passed out. The victim was lying in a pool of blood, and the appellant ran to call for help. When the appellant returned home, Paul was gone. Given that the appellant told Doran about the crime, we agree with the trial court that Doran's testimony was highly relevant. Doran also testified that the appellant told her to get a message to Paul and that Doran would have to answer to the appellant if Doran did not do as the appellant had instructed. While Doran's testimony was somewhat prejudicial, given the probative value of her testimony, we conclude that Doran's testimony was admissible.

Regarding the admissibility of the recording, the appellant talked about the evidence, and the recording corroborated Doran's testimony. Therefore, the recording was relevant. The recording was prejudicial because the appellant used profanity throughout her conversation with Doran and told Doran to "do what I tell you to do" and "don't fuck me 'cause then you'll have to answer to me." However, the appellant spoke casually with Doran before and after the "threat," and the appellant's voice was not particularly threatening. We note that the trial court later said during a bench conference, "I'm not sure it damages her that much." We agree and conclude that the probative value of the recording was not substantially outweighed by the danger of unfair prejudice. Therefore, the trial court properly ruled that Doran's testimony and the recording were admissible

## D. Flight Instruction

Finally, the appellant contends that the trial court erred by refusing to give the jury a flight instruction for Shyane Paul's actions after the victim's murder. The State argues that the trial court properly refused to give the instruction because the instruction pertains to a defendant. We agree with the State.

The appellant requested that the trial court instruct the jury on Tennessee Pattern Instruction 42.18, the instruction on flight, and insert Shyane Paul's name in place of "defendant" throughout the instruction. The trial court refused, concluding that the instruction applied only to the flight of a defendant.

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n. 20 (Tenn. Crim. App. 1994). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

Tennessee Pattern Instruction 42.18, states as follows:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.

The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.

If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

Whether there was flight by the defendant, the reasons for it, and the weight to be give to it, are questions for you to determine.

Tennessee Pattern Jury Instruction 42.18--Criminal (11th ed. 2007).

The wording of the pattern flight instruction demonstrates that it applies only to a defendant. Moreover, had the trial court given the instruction and substituted Paul's name for "defendant" throughout, the instruction would have directed the jury to determine Paul's guilt. Such an instruction would have been improper because the only guilt the jury was to determine in this case was that of the appellant. Therefore, the trial court properly refused to give the requested instruction.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-20-